J-S27031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.L., AN INCAPACITATED PERSON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.L. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 509 EDA 2022 |

Appeal from the Decree Entered January 19, 2022
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s):  2021-X4914

BEFORE:  STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED FEBRUARY 7, 2023**

J.L. appeals from the Orphans' Court's incapacitation adjudication and appointment of a plenary guardian of his person and estate.  We affirm.

In November 2021, Sarah L. Maus, LCSW, ACSW, on behalf of Abington Hospital-Jefferson Health ("the hospital") filed a petition for the appointment of a permanent plenary guardian of the person and estate of J.L., an alleged incapacitated person.[1]  The evidence presented at the January 2022 incapacity hearing was as follows:

J.L. is an eighty-year-old attorney who lived for decades by himself in a single-family home in Hatboro.  *See* N.T., 1/19/22, at 42, 49.  In October 2021, he telephoned his sister, Maureen Lester ("Lester"), on five consecutive

---

[1] J.L.'s sister, Maureen Lester ("Lester"), and her daughter and son, none of whom share J.L.'s last name, consented to, and joined in, the petition.  *See* N.T., 1/19/22, at 41.

nights and said "nothing" when asked what was new. *See id*. at 40-41. J.L. and his sister were not particularly close and usually spoke only once every two weeks. Based on their conversations, Lester suspected something was seriously wrong with J.L. *See id*. During J.L.'s call on the fifth night, Lester told him she would make the two-and-one-half-hour drive to his home the next morning. Lester immediately called the police in J.L.'s area and asked them to do a wellness check. The police observed J.L.'s house to be in a deplorable condition. J.L. declined their offer of an ambulance or the assistance of an EMT. *See id*. at 40-42, 49.

Lester and her daughter went to J.L.'s house. They found the door unlocked and J.L. sitting on the top step of the second-floor staircase. J.L. was very weak and unusually thin. *See id*. at 43. According to Lester, J.L. said he had fallen five days before and had a concussion but had not sought treatment. *See id*. J.L. declined Lester's offers to take him to a doctor or summon an ambulance. *See id*. at 43-44. Lester's daughter called for assistance. An ambulance arrived, as well as two police officers. *See id*. at 44. They found J.L.'s home contaminated with mice feces and human waste; one of the police officers said under his breath, "We should call the EPA." *See id*. at 44-45.

The ambulance took J.L. to the hospital. He was very weak and dehydrated and had not been treating his diabetes. *See id*. at 34-35. Lester later signed papers committing J.L. for treatment. *See id*. at 50-53.

Approximately three weeks after J.L.'s initial hospitalization, Lester returned to his house to attempt to clean it. She found mice droppings, a five-inch stack of decades-old papers on the floor of J.L.'s home office, and smeared feces and several-year-old legal papers on the seat of his car. Lester's brother-in-law took a series of photographs that day depicting the state of the house, which had not changed since Lester had been there. *See id*. at 45-50, 62. When Lester took her children to visit J.L. at the hospital about one week later, J.L. insulted her, got out of bed, and chased the family down the hall yelling, "Get out. Get out." *See id*.

Dr. Sam Carson ("Dr. Carson"), a psychiatrist at the hospital with a subspeciality in geriatric psychiatry and thirty years of work experience and training, evaluated J.L. in October and November 2021 at the hospital. *See* N.T., 1/19/22, at 5-6.[2] Dr. Carson diagnosed J.L. as having probable neurocognitive disorder/acute encephalopathy. *See id*. Dr. Carson determined that J.L. was totally impaired in his knowledge of and ability to understand his physical condition and medical problems,[3] his ability to decide

_____

[2] Dr. Carson found J.L. to be hostile, generally uncooperative, and verbally abusive, which prevented Dr. Carson from conducting standardized testing. *See* N.T., 1/19/22, at 15-16, 23-26. Dr. Carson testified that he was nevertheless able to incorporate elements of standardized tests into his assessment, and thereby obtained "ample insight into [J.L.'s] capacity to participate in his medical decision-making." *See id*. at 24.

[3] J.L. repeatedly and inaccurately told Dr. Carson that he had no medical or physical problems, and did not "go along with" the information on his medical
*(Footnote Continued Next Page)*

whether to accept medical treatments,[4] his capacity to receive and evaluate information effectively, and to provide for his physical safety or respond to emergency situations. Dr. Carson also determined that J.L.'s condition would not improve. *See id*. at 5-10, 18-20, 31.[5] Dr. Carson concluded that J.L. is totally incapacitated. *See id*. at 13, 17, 19-20, 28-29, 31; *see also* Dr. Carson's Expert Report at 4. Because J.L. was totally impaired in these areas, Dr. Carson recommended that J.L. live in a skilled nursing facility. *See id*. at 12-13, 17-19.[6]

Maus tried to address guardianship issues with J.L. during his hospitalization, but he declined to discuss the subject, or the guardianship hearing, with her and called her "a few choice words." *See* N.T., 1/19/22, at

_____

charts about his history of illnesses, which Dr. Carson believed was likely the result of denial or an inability to remember conversations with his medical team. *See* N.T., 1/19/22, at 27-28. In fact, J.L.'s medical conditions included hyperglycemia, hypokalemia, and pre-renal acute kidney injury. *See* Dr. Carson's Expert Report at 2.

[4] J.L. has refused lab tests and at times refused treatments. *See* N.T., 1/19/22, at 15-16.

[5] Dr. Carson also determined that J.L. needed some help with his short-term memory, which is dependent on his current health status which requires supervision, a condition that continued to be true at the time of the incapacity hearing. *See id*. at 5-11.

[6] Dr. Carson reported that J.L.'s neglect of his bodily functions (including urinating and defecating in his hospital bed and lying in his own excrement), his denial of medical problems, and his lack of insight into the need for medical improvement could probably improve over time in a safe, supervised setting but would require future reassessment. *See id*. at 12-13, 26.

32-33. She also testified that J.L.'s lack of cooperation prevented her from arranging to have a service clean out J.L.'s house to permit the possibility of his returning there. *See id*. at 70.

J.L. testified that the photographs of his home were unrecognizable, his house was in good order before he was admitted to the hospital, and Lester broke into his home and betrayed him by using the police to abduct him when he had no medical conditions. *See id*. at 63-66. He denied having any bladder or bowel problems. *See id*. at 64. He said that Lester's testimony he had told her he had a concussion was a "lie" and "preposterous," and that he has no desire to keep in touch with Lester or her children. *See id*. at 66-67. J.L. declared that he was fully functional, a practicing attorney at the time of his admission to the hospital, and able to live on his own. *See id*. at 67. J.L. stated that he was restrained against his will and that Dr. Carson "just makes stuff up. There's no basis for anything that he says." *See id*. at 68.

At the conclusion of the hearing, the court told J.L. that it believed he needed help and that it was appropriate to appoint someone to assist him, although "[t]hat can always be changed. You always have the right to come back." *Id*. at 70. The court found that J.L. was a totally incapacitated person whose "acute metabolic encephalopathy, hyperglycemia, [and] prerenal acute kidney injury, [are] conditions that totally impair his capacity to receive and evaluate information effectively and to make and communicate decisions concerning management of his financial affairs or to meet essential

requirements for his physical health and safety." *Id*. at 71. The court found that a guardian was medically necessary to protect and advocate for J.L.'s needs, welfare, and interests and that no less restrictive alternative to the appointment of a plenary guardian of J.L. and his estate existed. The court appointed Edythe Shapiro as plenary guardian of J.L. and his estate. *See id*. at 71-73.

J.L. filed a timely notice of appeal. He and the trial court complied with Rule 1925.

On appeal, J.L. presents the following issues for our review:

1. Whether the [t]rial court abused its discretion and committed an error of law in finding that [J.L.] was a totally incapacitated person and in need of a plenary [g]uardian of the person and [g]uardian of the estate[?]

2. Whether the [t]rial [c]ourt abused its discretion by failing to properly weigh the testimony of Dr. Sam Carson in its determination that [J.L.] was a totally incapacitated person in need of a [g]uardian of the person and of the estate, by failing to fully consider Dr. Carson's testimony that his diagnosis of neurocognitive disorder status post[-]acute encephalopathy was only "probable", and that the condition of [J.L.] has modestly improved since his admission to the hospital[?]

3. Whether the [t]rial [c]ourt abused its discretion by failing to properly weigh the testimony of Dr. Sam Carson in its determination that [J.L.] was a totally incapacitated person and in need of a [g]uardian of the person and of the estate; specifically, by failing to consider Dr. Carson's admission that the only testing given by him to [J. L.] was a chart review, a mental status exam in a face-to-face interview and that the Expert Report prepared by and testified to by Dr. Carson and admitted into evidence stated [J.L.] was unimpaired as to communicating decisions and as to long-term memory and that Dr. Carson did not have information to assess the ability

- 6 -

of [J.L.] to manage his finances and his ability to resist scams[?]

4. Whether the [t]rial [c]ourt abused its discretion by failing to properly weigh the testimony of [J.L.] in its determination that he was a totally incapacitated person in need of a guardian of the estate and guardian of the person; specifically, by failing to adequately weigh the testimony of [J.L.] to include that he had lived in and maintained his own single-family residence for twenty-eight years, that all of [J.L.]'s bills and expenses had been paid until he was taken to the hospital, and that he was still practicing law as a licensed attorney in Pennsylvania and was current in his Continuing Legal Education requirements, that [J.L.] disagreed with his sister's testimony that [J.L.] told her he had fallen and sustained a concussion and where no medical testimony was submitted regarding the existence of a concussion having occurred, and that [J.L.] was able to walk without difficulty, feed himself and communicate without difficulty[?]

*See* J.L.'s Brief at 12-14 (reordered).

J.L. challenges the Orphans' Court's finding that he is a totally incapacitated person in need of a plenary guardian of the person and guardian of the estate and asserts that the court failed to properly weigh Dr. Carson's testimony and his own. We address J.L.'s issues together because they are related.

Our standard of review of a determination of the Orphans' Court requires us to:

determine whether the record is free from legal error and the court's factual findings are supported by the record. Because the Orphans' Court sits as the fact-finder, it determines the credibility of witnesses and, on review, we will not reverse its credibility decisions absent an abuse of discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are

palpably wrong or clearly inapplicable, we will reverse the court's decree.

*Interest of M.A.*, 284 A.3d 1202, 1210 (Pa. Super. 2022) (internal citation omitted).

Under the Probate, Estates, and Fiduciary Code, a person may be adjudicated incapacitated, and a guardian of the person and the estate appointed, if the petitioner seeking the adjudication shows by clear and convincing evidence that the person's:

> ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety.

*See* 20 Pa.C.S.A. § 5501; *see also* 20 Pa.C.S.A. §§ 5511(a), 5512.1(b). The petitioner must present testimony:

> from individuals qualified by training and experience in evaluating individuals with incapacities of the type alleged by the petitioner, which establishes the nature and extent of the alleged incapacities and disabilities and the person's mental, emotional and physical condition, adaptive behavior and social skills.

*See* 20 Pa.C.S.A. § 5518. In determining incapacity, the Orphans' Court is required to make findings of fact concerning:

> (1) The nature of any condition or disability which impairs the individual's capacity to make and communication decisions.
>
> (2) The extent of the individual's capacity to make and communicate decisions.
>
> (3) The need for guardianship services, if any, in light of such factors as the availability of family, friends and other supports to assist the individual in making decisions and in light of the

existence, if any, of advance directives such as durable powers of attorney or trusts.

(4) The type of guardian, limited or plenary, of the person or estate needed based on the nature of any condition or disability and the capacity to make and communicate decisions.

(5) The duration of the guardianship.

20 Pa.C.S.A. § 5512.1. The law states a preference for limited guardianship. *See* 20 Pa.C.S.A. § 5512.1(6); *see also Gavin v. Loeffelbein*, 205 A.3d 1209, 1222 (Pa. 2019) (when a person is only partially incapacitated, the court shall appoint a limited guardian). A court may appoint a plenary guardian of the person and/or the estate only upon a finding that the person is totally incapacitated and in need of plenary guardianship services. *See* 20 Pa.C.S.A. § 5512.1(c), (e). *Accord Interest of M.A.*, 284 A.3d at 1213 (stating that the court's actions are to be guided by "a scrupulous adherence to the principles of protecting the incapacitated person by the least restrictive means possible").

J.L. does not articulate the basis for his issue that the court erred in finding that he is a totally incapacitated person in need of a plenary guardian of the person and estate. Instead, he argues that the Orphans' Court failed to properly weigh Dr. Carson's testimony that: (1) he had contacts with J.L. twelve times but the expert report lists only three contact dates; (2) he administered no standardized testing; (3) J.L.'s condition improved while in the hospital; (4) his diagnosis of J.L.'s condition was only "probable", (5) his expert report concluded that J.L.'s long-term memory and ability to

communicate decisions were not impaired; and (6) there was not enough information to assess J.L.'s ability to manage his finances. J.L. also asserts that the Orphans' Court failed to weigh his own testimony that he: (1) denied telling his sister that he fell or had a concussion; and (2) is functional, attentive to all his financial matters, is able to maintain the house where he has lived for twenty-eight years and wants his freedom of action restored. *See* J.L.'s Brief at 24-32.[7]

The Orphans' Court credited the testimony of Dr. Carson, Lester, Maus, and documentary evidence including Dr. Carson's expert report and the "appalling condition of [J.L.]'s home," and found clear and convincing evidence that J.L. is a totally incapacitated person. *See* Orphans' Court Opinion, 5/2/22, at 12. The court found that J.L. was not as credible as the testimony of the witnesses and the documentary evidence. *See id*.[8] The court found that J.L. has a series of physical conditions that totally impair his capacity to receive and evaluate information effectively and to make and communicate decisions concerning management of his financial affairs or to meet essential

_____

[7] J.L. asserts the Orphans' Court failed to properly weigh Dr. Carson's testimony and his own. Because J.L.'s challenges related to the weighing of the testimony are directed to whether there was clear and convincing evidence of his total incapacity, we consider them in assessing whether the record supports the Orphans' Court's determination that he is a totally incapacitated person who requires plenary guardianship.

[8] The Orphans' Court noted that neither substantive evidence nor the corroborative testimony of other witnesses supported J.L.'s testimony about the infringement of his rights. *See* Orphans' Court Opinion, 5/2/22, at 12.

requirements for his physical health and safety. The court found that there was no less restrictive alternative to the appointment of a plenary guardian of the estate and of the person, which was medically necessary to protect and advocate for J.L.'s needs, welfare, and interests. *See* N.T., 1/19/22, at 70-73; Orphans' Court Opinion, 5/2/22, at 11-12.

Having reviewed the record and the orphans' court's opinion, we conclude that the record amply support's the orphans' court's finding that J.L. is totally impaired in his ability to meet essential requirements for his physical health and safety, and that the court properly determined that J.L.'s total incapacity was proved by clear and convincing evidence. *See* 20 Pa.C.S.A. §§ 5501, 5511(a), 5512.1(b).[9] J.L. has an array of debilitating physical conditions and, more important, adamantly continues to deny those conditions despite the contrary evidence from his medical charts, the unsanitary and disordered nature of his house and car, the weakened condition his sister found him in, and his inattentiveness to his inability to control his bladder or

---

[9] The evidence concerning J.L.'s financial impairment is less clearcut. J.L. testified that he was current with his bills when he was hospitalized. *See* N.T., 1/19/22, at 66. No other witness had intimate knowledge of his finances at that time, and Dr. Carson did not testify that J.L. was totally incapacitated because he could not manage his financial affairs. However, because the evidence supports the Orphans' Court's finding of total incapacity based on J.L.'s inability to meet essential requirements for his physical health and safety, there is a proper record basis to affirm the Orphans' Court's finding that J.L. was completely incapacitated. *See Lynn v. Nationwide Ins. Co.*, 70 A.3d 814, 823 (Pa. Super. 2013) (holding that this Court may affirm a lower court's ruling on any basis supported by the record on appeal).

- 11 -

bowels and to treat his diabetes. All of these factors supported Dr. Carson's testimony, which the orphans' court credited, that J.L. is totally unable to meet essential requirements for his physical health and safety. Thus, the orphans' court did not err in finding J.L. totally incapacitated and in need of a plenary guardian of the person and estate. ***See*** Pa.C.S.A. §§ 5501, 5511(a), 5512.1, 5518.

Regarding J.L.'s assertion of evidence the orphans' court allegedly failed to properly weigh, we note the following: (1) concerning the alleged discrepancy in Dr. Carson's testimony about the number of times he and J.L. met, Dr. Carson testified that they met three times before he prepared his expert report in November 2021, but that they continued to meet and met as recently as January 18, 2022, ***see*** N.T., 1/19/22, at 6; (2) concerning the adequacy of his testing, Dr. Carson testified that he was able to ask some of the questions that constitute part of one standardized test; that another test was of limited utility but that much of the factors in that test are encapsulated in the mental status evaluation in the expert report; and that the interview Dr. Carson was able to conduct "provided ample insight into [J.L.'s] capacity to participate in medical decision-making," ***see id***. at 23-26; Orphans' Court Opinion, 5/2/22, at 9; (3) concerning J.L.'s modest improvement while hospitalized, Dr. Carson testified that J.L.'s orientation as to time and place had improved, not his diagnosis of neurocognitive disorder, and further Dr. Carson was concerned that if J.L. were returned to the community, he would

return to neglecting his healthcare needs "as he seemed to do throughout his hospital stay, and from the history gleaned," *see* N.T., 1/19/22, at 6-7, 28-29; Orphans' Court Opinion, 5/2/22, at 9-10; (4) concerning Dr. Carson's assertion that J.L.'s diagnosis of "acute metabolic encephalopathy was 'probable,' Dr. Carson testified without equivocation that J.L.'s condition totally impaired his ability to manage his healthcare, provide for his physical safety, and respond to emergency situations, *see* N.T., 1/19/22, at 10; (5) concerning Dr. Carson's initial conclusion that J.L. was not impaired in communicating his decisions or long-term memory, Dr. Carson subsequently concluded that J.L.'s long-term memory was partially impaired, *see* N.T., 1/19/22, at 13, and (6) concerning the lack of evidence about J.L's financial ability, the only testimony on that question came from J.L, whom the orphans' court was generally disinclined to find credible.

With regard to J.L.'s testimony that he did not tell his sister that he fell or had a concussion and that he is functional and able to attend to his financial affairs and his house, the trial court emphatically rejected those assertions in reliance on the testimony and evidence of other witnesses it heard and found credible:

> [J.L.] would have us believe, simply because he says so and denies the allegations of his sister [Lester], Ms. Maus, and Dr. Carson that [he] had been living in squalor, in dangerously poor health and in denial of his multiple medical conditions, that he is capable of independent living and can adequately care for himself. [J.L.] presented no evidence, just his adamant denial, to refute these factual conclusions made by multiple witnesses and bolstered by photographic evidence. Nor did this Court find

credible [J.L.]'s exhortations as to his ongoing law practice, the excellent condition of his home, his "abduction" by his family members against his will, with the assistance of police, and his general physical, mental and fiscal wellbeing. While [this Court] is sympathetic to [J.L.]'s wishes to live independently and acknowledges his lifetime of success doing so until recently, we found the other witnesses to be far more compelling and concluded that [J.L.] does not have a clear understanding of his current mental and physical conditions and is no longer able to maintain that independence. In reaching these conclusions, we were mindful of the longstanding holding in Pennsylvania that the testimony of lay witnesses who have observed the alleged incompetent [sic] person is admissible and highly probative since "one's mental capacity is best determined by his spoken words, his acts, and his conduct." ***In re Estate of Wood***, [533 A.3d 772, 774 (Pa. Super. 1987) (citation omitted)].

*See* Orphans' Court Opinion, 5/2/22, at 11.

Thus, contrary to J.L.'s issues there was ample support for the orphans' court's credibility findings, and we discern no abuse of discretion in the court's weighing of the evidence when finding that J.L. is totally incapacitated nor that it was error of law to appoint a plenary guardian of the person and the estate.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/7/2023

- 14 -